**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-20-0000717**
**27-AUG-2021**
**07:53 AM**
**Dkt. 100 SO**

NO. CAAP-20-0000717

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

IN THE INTEREST OF AB and BB

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 14-00235)

SUMMARY DISPOSITION ORDER
(By: Ginoza, Chief Judge, Leonard and Hiraoka, JJ.)

Appellant Mother (**Mother**) appeals from the Order Terminating Parental Rights, filed on October 21, 2020, and the Orders Concerning Child Protective Act, filed on October 22, 2020 (collectively, the **TPR Orders**), in the Family Court of the First Circuit (**Family Court**).[1]  Mother also challenges, in part, the Family Court's November 19, 2020, Findings of Fact and Conclusions of Law (**FOFs and COLs**).  Mother's parental rights to her children, AB and BB (collectively, **Children**), were terminated and permanent plans with the goal of adoption were approved.[2]

---

[1]     The Honorable Jessi L.K. Hall presided.

[2]     The parental rights of Children's legal and natural father (**Father**) – who did not participate in these proceedings and was defaulted – were also terminated.

Mother raises four points of error on appeal, contending that: (1) the TPR Orders are wrong because there were less restrictive measures to ensure the best interests of the Childen; (2) FOF 90 is clearly erroneous because it lumped Mother and Father together, even though they are divorced, Mother was willing and able to provide Children with a safe family home, with the assistance of a service plan it was reasonably foreseeable that Mother would become willing and able to provide Children with a safe family home within a reasonable period of time, and the May 6, 2020 Permanent Plans (**Permanent Plans**) and goal of adoption were not in the best interests of the Children; (3) FOF 91 is clearly erroneous because Mother was willing and able to provide Children with a safe family home, with the assistance of a service plan it was reasonably foreseeable that Mother would become willing and able to provide Children with a safe family home within a reasonable period of time, and the Permanent Plans and goal of adoption were not in the best interests of the Children; and (4) COLS 15, 16, and 17 are wrong because Mother completed all of her services and it is implausible that she could have completed all of her services and still could not provide a safe family home for the Children, even with the assistance of a service plan.

Upon careful review of the record and the briefs submitted by the parties, and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Mother's points of error as follows:

FOFs 90 and 91 and COLs 15, 16, and 17 state:

FINDINGS OF FACT

. . . .

90. On September 30, 2020, pursuant to [Hawaii Revised Statutes (**HRS**)] § 587A-33(a), the court found by clear and convincing evidence that: (1) Mother and Father were not willing and able to provide the Children with a safe family home, even with the assistance of a service plan; (2) it was not reasonably foreseeable that Mother and Father would becoming [sic] willing and able to provide the Children with a safe family home, even with the assistance of a service plan, within a reasonable period of time; and (3) the Permanent Plans, with the goal of adoption, dated May 6, 2020, were in the best interests of the Children.

91. Accordingly, on September 30, 2020 the Court entered orders granting the DHS' Motion to TPR pursuant to HRS § 587A-33(b), terminating Mother and Father's parental rights, awarding permanent custody of the Children to the DHS, and ordering the permanent plans, with the goals of adoption, dated May 6, 2020. The Order Terminating Parental Rights and the Letters of Permanent Custody were filed on October 21, 2020.

. . . .

CONCLUSIONS OF LAW

. . . .

15. Mother and Father are not presently willing and able to provide the children with a safe family home, even with the assistance of a service plan.

16. It is not reasonably foreseeable that Mother and Father will become willing and able to provide the child[ren] with a safe family home, even with the assistance of a service plan, within a reasonable period of time.

17. The Permanent Plans dated May 6, 2020, with the goal of adoption, are in the best interest of the children.

As a preliminary matter, we note that the Children entered foster care in January of 2015. Mother contends that FOFs 90 and 91 are clearly erroneous and COLs 15, 16, and 17 are wrong because Mother was willing and able to provide a safe family home, especially with the assistance of a service plan, it was reasonably foreseeable Mother would become willing and able

to provide a safe family home, especially with the assistance of a service plan, within a reasonable period of time, and the Permanent Plans with the goal of adoption were not in the best interest of the children.  Mother challenges FOF 90 because the Family Court "lumped together father and mother in the finding of fact, even through the two are divorced."  Mother claims that there was no clear and convincing evidence that she was unwilling or unable to provide a safe family home, even with the assistance of a service plan.  Mother notes that she completed all of the services identified in the service plan, that she had homeschooled the Children,[3] and a witness, Dr. Taketa-Wong, testified that Mother's house was livable and that Dr. Taketa-Wong found no signs of abuse, bruising, or injury.  Mother submits that "the court can terminate parental rights if the child is likely to be adopted.  That was not the case here, especially as AB was only a few months away from his 18th Birthday. . .  Thus, continued supervision of [Mother] and a continued proposed reunification plan was clearly in the best interests of AB and BB[.]"

FOF 90 is not clearly erroneous because it stated both Mother and Father as unwilling and unable to provide a safe family home.  Generally speaking, marital status is not implicated in a proceeding related to the termination of parental

---

[3]     This appears to be in response to the fact that when BB entered foster care at age 9, he had never attended school.

rights. See HRS § 587A-33 (2018).[4] The Family Court found Father had been defaulted in the case since November 2, 2015, and had expressed to Petitioner-Appellee the State of Hawaiʻi, Department of Human Services (**DHS**) that he did not want to reunify with the Children or participate in any services; thus, Father was unwilling and unable to provide a safe family home.

---

[4]  HRS § 587A-33 provides, in relevant part:

**§ 587A-33  Termination of parental rights hearing.**
(a) At a termination of parental rights hearing, the court shall determine whether there exists clear and convincing evidence that:

    (1)   A child's parent whose rights are subject to termination is not presently willing and able to provide the parent's child with a safe family home, even with the assistance of a service plan;

    (2)   It is not reasonably foreseeable that the child's parent whose rights are subject to termination will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, which shall not exceed two years from the child's date of entry into foster care;

    (3)   The proposed permanent plan is in the best interests of the child.  In reaching this determination, the court shall:

        (A)   Presume that it is in the best interests of the child to be promptly and permanently placed with responsible and competent substitute parents and family in a safe and secure home; and

        (B)   Give greater weight to the presumption that the permanent plan is in the child's best interest, the younger the child is upon the child's date of entry into foster care; and

    (4)   The child consents to the permanent plan if the child is at least fourteen years old, unless the court consults with the child in camera and finds that it is in the best interest of the child to proceed without the child's consent.

The FOFs concerning Father were not the basis for the Family Court's termination of Mother's parental rights. There were independent and unrelated bases for terminating Mother's parental rights.

We conclude that there was clear and convincing evidence that Mother was not presently willing and able to provide a safe family home, even with the assistance of a service plan, even though she had completed services. Unchallenged FOFs include that, in 2011, DHS was contacted several times due to Mother's violent, threatening, and out of control behaviors involving the Children. In 2014, DHS assumed temporary foster custody of the Children through police protective custody and confirmed physical threat of abuse, neglect, and educational neglect. At the same time, Mother was evicted by the police, and the home was observed to be unsanitary, filthy, and strongly smelling of urine; the home had very little food, several windows were broken, and the Children were not enrolled in school and were socially isolated.

Jahona Jackson (**Jackson**), a DHS human services professional qualified to testify as an expert in the field of social work and child protective and child welfare services, testified that both AB and BB have high needs. AB, who is autistic, has needs that are more physical, and BB needs emotional stability.

It was reported that by February 15, 2019, Mother completed recommended services in her service plan such as parenting classes, individual therapy, and anger management, but

not intensive in-home family therapy to address topics such as reconnection, coping skills, developing a support system, community linking, and parenting a child with special needs. Although Mother had completed an anger management course, she had inconsistent insight and use of skills, which caused her ability to manage her anger to remain a concern.

Among other incidents that occurred after Mother received services, with respect to AB, in April 2019, Mother decided not to give AB all of his prescribed medication during an unsupervised weekend visit because she wanted to see how AB would do without the medication. Mother reported that AB attacked her while she was driving on the freeway. In July 2019, when AB was returned from another visit with Mother, there were still six tablets in the bottle for his prescription medication, indicating that Mother had not provided AB with his medication as prescribed. Mother claimed information from the internet indicated AB's prescribed medication was poisoning him and instructed the resource caregivers to stop giving it to AB. Jackson testified that Mother displayed no insight as to the possible harmful and life-threatening effects of altering AB's medications without medical guidance.

In May 2020, AB was hospitalized for water intoxication, which occurred after Mother allowed or gave AB more than twelve liters of water. Even after being advised by hospital personnel not to give AB any more fluids while waiting to be assessed, Mother gave AB three more liters of water. AB cannot regulate his food or beverage intake, but Mother suggested

that AB stop one of his medications because she thought it made AB repeatedly ask for water. Jackson stated Mother did not show insight as to administering basic needs of a child with AB's conditions, because a caregiver would limit the amount of AB's water by redirection or just saying no.

DHS's concerns about Mother's ability to parent BB include that BB did not believe that Mother would be able to provide the structure he would need, BB was exposed to emotional and mental trauma, and Mother's absence from 2015 to 2017 caused trauma to BB, who was fifteen years old at the time of trial.[5] Mother would randomly show up to a foster home without having visitation, and demand to see the Children for their birthdays but then would not participate in the family court case to reunify with the Children. Jackson did not think that Mother had addressed the issues that necessitated removal of the Children because Mother completed services, but failed to display insight into the Children's needs. Jackson stated that Mother is not able to provide for BB's emotional and psychological needs, she failed to show insight or acknowledgments, she has not expressed any responsibility concerning how the Children are developing, and she does not think that she contributed to the Children's

---

[5] FOFs 26 and 27, which are not challenged on appeal, state:

26. Mother was absent in this case and defaulted for over two years, from April 22, 2015 through June 14, 2017. During this time, Mother did not contact the Children or maintain any contact with the DHS. The DHS made several reasonable attempts to contact Mother and engage Mother in services by calling her and sending her emails.

27. Ms. Jackson testified that during this time period she attempted to call Mother from other phone numbers and that when Mother realized it was Ms. Jackson, Mother would hang up.

emotional and/or developmental state. During therapy sessions involving Mother and BB, Mother was told not to do certain things, but Mother persisted in those things, such as asking BB to live with her, promising BB things, offering BB things, and insisting on giving BB a cell phone during therapeutic services. Mother denied such actions, but the Family Court did not find Mother's testimony to be credible. The Family Court found Jackson to be a credible witness.

Jennifer Cartwright (**Cartwright**), BB's therapist, testified that Mother was defensive and unable to admit to some of her parenting issues. Cartwright had concerns regarding Mother's ability to provide for BB's safety and needs because Mother was unable to recognize what is in BB's best interest; Mother instead tried to bribe BB with games and other things. Cartwright stated that Mother cannot stand up to BB and Mother gave in to whatever BB wanted. In Cartwright's opinion, it is not in BB's best interest to reunify with Mother because further dragging the case on would not allow BB to move forward. The Family Court found Cartwright to be a credible witness.

The hearing on whether to terminate Mother's parental rights began on July 23, 2020, although from April to June 2020, DHS was not able to determine Mother's whereabouts.

Mother testified that AB was not enrolled in school at the time DHS became involved because he was abused at Ewa Elementary School, BB was also abused at public school, and BB asked to do home school. Mother did not, however, register with or inform the Department of Education that the Children were

being homeschooled nor certify curriculum compliance. As noted above, the Family Court found Mother was not credible.

Mother's reliance upon Dr. Taketa-Wong's opinion that Mother's house was livable is unwarranted because Dr. Taketa-Wong visited Mother's residence in 2013, while DHS reported that the family home was unsanitary and filthy in November of 2014. Likewise, Dr. Taketa-Wong's statement that she found no signs of abuse, bruising, or injury to AB is unhelpful because she saw AB in 2013, while DHS observed bruising and marks when it became involved in November of 2014. In any case, Jackson clarified that there was no allegation of physical abuse, only threat of abuse, neglect, and physical neglect.

For these reasons, as well as the entirety of the evidence in the record of appeal, we conclude that there was clear and convincing evidence that Mother was not presently willing and able to provide a safe family home, even with the assistance of a service plan. Even after completing services, Mother was not able to provide for AB's physical needs by preventing harm. Mother was not able to provide for BB's emotional and psychological needs, by recognizing the harm she caused and following his therapist's guidelines for conjoint therapy sessions which would lead to reunification. Mother disengaged from the case in the months immediately prior to the start of the hearing seeking to terminate her parental rights (after a previous absence from the case, without maintaining contact with the Children or DHS, for a period of over two years).

We further conclude that there was clear and convincing evidence that it was not foreseeable that Mother would become willing and able to provide a safe family home, even with the assistance of a service plan, within a reasonable period of time not to exceed two years from the date the Children entered foster care. The Children entered foster care in January of 2015. At the time the hearing on terminating Mother's parental rights began on July 20, 2020, the Children had been in foster care for five and a half years. Clearly, it was not foreseeable that Mother would become willing and able to provide the children with a safe family home within two years of entering foster care. In addition, Cartwright testified that it would take two more years of family and individual therapy before Mother could have unsupervised contact with BB. Thus, it would have been at least another two years before Mother could be reunified with the Children.

Mother challenges the Family Court's approval of the Permanent Plans with adoption as the goal for both AB and BB. Mother incorrectly suggests that the court can only terminate parental rights if the child is likely to be adopted or that family supervision or continued efforts at reunification is possible, after a finding that a parent is not willing and able to provide a safe family home and it is not reasonably foreseeable a parent will become willing and able to provide a safe family home. Rather, the Family Court must find that the proposed permanent plan is in the best interest of the child before terminating parental rights. HRS § 587A-33(a)(3). A

permanent plan must state whether the permanency goal will be achieved through adoption, legal guardianship, or permanent custody, with adoption being the preferred option, unless there is a compelling reason that legal guardianship or permanent custody is in a child's best interest. HRS § 587A-32(a)(1) (2018). Thus, the likelihood of adoption is not required before parental rights may be terminated; family supervision or continued reunification efforts is not an option for a permanent plan. Because AB and BB were over fourteen years of age at the time Mother's parental rights were terminated, AB and BB were required to consent to the permanent plan or the court was required to find it was in the Children's best interest to proceed without their consent. HRS § 587A-33(a)(4). BB consented to the permanent plan with the goal of adoption and the Family Court found that AB was not competent to consent to a permanent plan. Although AB would be turning eighteen a short time after Mother's parental rights were terminated, DHS stated that it would extend foster care past AB's 18th birthday to ensure that he has a caregiver. Mother provided no argument that it was in the Children's best interest that the permanent plan goal should be legal guardianship or permanent custody. Therefore, we conclude that FOFs 90 and 91 are not clearly erroneous and COLs 15, 16, and 17 are not wrong.

For these reasons, the Family Court's October 21, 2020, and October 22, 2020 TPR Orders are affirmed.

DATED: Honolulu, Hawaiʻi, August 27, 2021.

On the briefs:

Shawn A. Luiz,
for Respondent/Mother-Appellant.

Scott D. Boone,
Julio C. Herrera,
Ian T. Tsuda,
Deputy Attorneys General,
for Petitioner-Appellee
 Department of Human Services.

Michelle K. Moorehead,
(Legal Aid Society of Hawaiʻi),
Guardian Ad Litem for BB

/s/ Lisa M. Ginoza
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Keith K. Hiraoka
Associate Judge